## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## COLUMBIA DIVISION

| | | |
|---|---|---|
| **CLINTON D. MOSLEY,** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | **No. 1:12-00023** |
| | ) | **Judge Nixon/Brown** |
| **v.** | ) | |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **COMMISSIONER OF THE SOCIAL** | ) | |
| **SECURITY ADMINISTRATION** | ) | |
| | ) | |
| **DEFENDANT.** | ) | |

**To: The Honorable Judge John T. Nixon, Senior United States District Judge**

### REPORT AND RECOMMENDATION

For the reasons explained herein, the Magistrate Judge **RECOMMENDS** that the plaintiff's motion for judgment on the administrative record (the record) be **GRANTED**, the Commissioner's decision be **REVERSED**, and the cause **REMANDED** for further administrative proceedings consistent with this report and recommendation, to include rehearing.

### I.       Procedural History

The plaintiff protectively filed for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) on October 27, 2008 (DE 10, pp. 134-39; 140-44).[1] He claimed an onset date of July 14, 2008 (DE 10, p. 136). The plaintiff claimed disability due to cyclic vomiting and irritable bowel syndrome (DE 10, p. 161).

On February 12, 2009, the Commissioner denied the DIB and SSI claims (DE 10, p. 85). On March 10, 2009, the plaintiff timely filed for reconsideration (DE 10, p. 89). On June 24, 2009, the Commissioner again denied the claims (DE 10, p. 90).

---

1 Page numbers referring to the record herein reflect the Bates Stamp.

On August 18, 2009, the plaintiff timely requested a hearing before an Administrative Law Judge (ALJ) (DE 10, p. 94). On November 30, 2010, the plaintiff appeared before the ALJ, David Ettinger (DE 10, pp. 37-77). Also appearing were Gordon Doss, the vocational expert (VE), and the plaintiff's representative, Susan Clasbey (Clasbey) (DE 10, p. 37). On December 20, 2010, the ALJ decided that the plaintiff was not disabled under Title II of the Social Security Act (Act), 42 U.S.C. §§ 416(i) and 423(d), or Title XVI of the Act, 42 U.S.C. § 1382(c) (DE 10, p. 30). On January 19, 2011, the plaintiff timely requested that an Appeals Council (AC) review the decision (DE 10, p. 19). On December 20, 2011, an AC denied the request (DE 10, p. 1).

On February 22, 2012, the plaintiff timely brought the instant action (DE 1). On May 28, 2012, the defendant filed his answer and the record (DE 9-10). On July 29, 2012, the plaintiff filed the motion for judgment on the record (DE 14)[2] and memorandum in support of the motion (DE 15) pursuant to 42 U.S.C. §§ 405(g) and 1383(c), seeking judicial review of the final decision of the Social Security Administration (the SSA), through its Commissioner, as set out by the ALJ. On October 15, 2012, the defendant filed a response in opposition (DE 18). On October 31, 2012, the plaintiff filed a reply (DE 20). On November 14, 2012, the defendant filed a motion for leave to file a sur-reply (DE 21). On November 15, 2012, the Court granted the defendant's motion (DE 22), and the defendant filed the sur-reply (DE 23).

The matter is now properly before the Court.

## II.     Review of the Record

### A.     Relevant Medical Evidence

In June 2000, the plaintiff was in a motor vehicle accident, and fractured most of his thoracic vertebrae (DE 10, p. 549). On June 30, 2000, the plaintiff presented to **Dr. Amit**

_____

2 While the plaintiff titled the motion a "motion for summary judgment," the Court construes it as a motion for judgment on the record.

**Choksi, M.D.**, on referral from **Dr. Matthew Dobias, M.D.**, with abdominal pain, nausea, vomiting, and a fifteen to twenty pound weight loss (DE 10, p. 549, 555). The plaintiff "had no previous medical problems." (DE 10, p. 558). Testing revealed a "duodenal[3] obstruction…consistent with a superior mesenteric artery syndrome[4] (SMA syndrome)" (DE 10, pp. 561, 568). To resolve the SMA syndrome and the weight loss, the plaintiff required intravenous nutrition on July 07, 2000 and May 21, 2001 (DE 10, pp. 561, 578).

In 2001 and 2002, the plaintiff continued to experience nausea, vomiting, and weight loss, necessitating hospitalization (DE 10, pp. 601-09, 612-17). The plaintiff also experienced "remission" (DE 10, p. 631) of his symptoms, intermittently (DE 10, pp. 625-26, 627, 629-31). "The symptoms [would] last…from one week to one month, then spontaneously resolve." (DE 10, p. 613). On November 16, 2001, the plaintiff presented to **Dr. Howard Mertz, M.D.**, who found "no overt pathology to explain [the plaintiff's] vomiting." (DE 10, p. 618).

On October 19, 2006, the plaintiff was admitted to the hospital with cramping, nausea, and vomiting (DE 10, p. 632). On October 20, 2006, **Dr. Mertz** found that the plaintiff had "a motility[5] disorder" (DE 10, p. 634) and likely "intermittent motility problems…affect[ing] his stomach and upper gut…[that in] some way relates to his [motor vehicle accident]…." (DE 10, p. 492). In 2007, the plaintiff continued to experience the same symptoms (DE 10, pp. 541-43).

---

3 Dorland's Illustrated Medical Dictionary 573 (Elsevier 2012) (1900) (Duodenem: "the first or proximal portion of the small intestine, much shorter than the following portions, extending from the pylorus to the jejunum; so called because its length is about 12 finger breadths.").

4 *Id.* at 1850 (Superior mesenteric artery syndrome: "compression of the third, or transverse, portion of the duodenum against the aorta by the superior mesenteric artery, resulting in complete or partial obstruction that may be chronic, intermittent, or acute; symptoms range from mild to severe, including nausea and vomiting, pain, and extreme distention of the stomach and duodenum.").

5 *Id.* at 1182 (Gastric motility: "the spontaneous movements of the stomach muscles that grind food and mix it with gastric secretions, and move the products into the duodenum." Intestinal motility: "the muscular movements of the various segments of the intestines to process digested food and most it along.").

On July 14, 2008, the plaintiff presented to **Dr. Dobias** with nausea, vomiting, and pain (DE 10, p. 297). **Dr. Dobias** admitted the plaintiff to Crocket Hospital Emergency Department (ED), where **Dr. Charles Love, M.D.** reported that "there ha[d] been no [cause] discovered for [the plaintiff's] problems." (DE 10, p. 243). **Dr. Dayaker Mallipeddi, M.D.** found that the plaintiff had gastritis and the plaintiff was discharged on July 21, 2008 (DE 10, p. 243, 249). On July 28, 2008, **Dr. Dobias** reported that the plaintiff was "better, still weak." (DE 10, p. 296). On August 04, 2008, the plaintiff presented to Crocket Hospital ED again with nausea and vomiting (DE 10, pp. 286-90). He was treated and discharged (DE 10, pp. 286-90). On August 12, 2008, **Dr. Dobias** reported that the plaintiff was "some better." (DE 10, p. 295).

On September 03, 2008, **Dr. Dobias** reported that the plaintiff had lost twenty-five to thirty pounds, and that heat and stress triggered the vomiting episodes (DE 10, p. 294). Dr. Dobias also reported "[w]e are going to let him get back to work on Monday if he is improved at that point." (DE 10, p. 294). On September 10, 2008, **Dr. Dobias** reported that the plaintiff was "not able to eat," and "[was] trying to get…disability." (DE 10, p. 293).

On September 29, 2008, the plaintiff presented to **Dr. Mertz**, who reported that:

[The plaintiff] returns in follow up for his cyclic vomiting syndrome. He has been seen by me several times in the past. He has been quite sick since July and has lost twenty-five pounds of weight. Since that time he has been to the ER again and again. He has spells where he is sick for two or three days with vomiting, abdominal pain, cramps, and some diarrhea. Then he will improve and be better for a couple of days and then the cycle continues…He feels that stress is a big problem here as he has lost his job and home mortgage is hard for him to afford if he is unemployed…Because of his vomiting syndrome, he has been unable to stay at work regularly and has lost his job…[The plaintiff] has symptoms of irritable bowel syndrome and cyclic vomiting. He is doing terribly currently. He has had approximately three months of great difficulty and progressive weight loss. [A procedure to test for small bowel obstruction] has been done by me twice in the past as well.

(DE 10, p. 491). On the same day, the plaintiff also presented to Crocket Hospital ED with pain, nausea, and vomiting (DE 10, pp. 278-79). He was treated and discharged (DE 10, pp. 278-79).

On October 09, 2008 and November 20, 2008, the plaintiff presented to **Dr. Dobias** for follow-up appointments (DE 10, pp. 291-92). On October 09, 2008, **Dr. Dobias** reported that:

> [The plaintiff] has had a horrible time, not only cyclic vomiting syndrome that he has been getting every few years for which he is really incapacitated with to now having these prolong[ed] episodes. He probably has some component of [irritable bowel syndrome] to them. He certainly is not able to work at the present time and may not long term. He is going to have a very difficult time if he has episodes like this where he misses work and is off from work for a month at a time or longer.

(DE 10, p. 292).

On December 17, 2008, the plaintiff, who was in town to see **Dr. Thomas Abell, M.D.**, presented to the University of Mississippi Medical Center (UMMC) ED with nausea, vomiting, and abdominal pain (DE 10, p. 303, 308). On December 22, 2008, **Dr. Abell** performed a procedure that revealed moderately severe esophagus inflammation and **Dr. Abell**[6] "placed a temporary gastric pacemaker."[7] (DE 10, p. 303). A neurology consultation revealed that the plaintiff's symptoms did not identify a condition that was causing the plaintiff's symptoms (DE 10, p. 305-06). On December 24, 2008, the plaintiff was discharged with home health (DE 10, p. 303).[8] On December 30, 2008, the plaintiff followed-up with **Dr. Abell's nurse, Danielle Spree, CFNP**, and "**Dr. Abell** saw the patient as well." (DE 10, pp. 439, 437-40, 705-08). The plaintiff reported "significant improvement in his symptoms," that he was "able to eat anything…and…larger amounts of food than before," "no vomiting or nausea since Christmas

---

6 (DE 10, p. 449) ("The procedure was performed by J. Trippe McNeese, M.D. and Naveed Ahman, M.D. in the presence of Dr. Abell, [who] was present for the entire procedure.").
7 Dorland's Illustrated Medical Dictionary 1360 (Elsevier 2012) (1900) (Gastric pacemaker: "electric potentials… regulate the frequency of gastric contractions.").
8 (DE 10, pp. 402-27) Quality First Home Care provided the home health services for, inter-alia, maintenance of the plaintiff's Peripherally Inserted Central Catheter (PICC), plaintiff education regarding PICC safety, review of forms, and creation of an emergency plan.

Day," "minimal occasional sharp pain to his abdomen…improved with the temporary [gastric pacemaker]." (DE 10, p. 437).

On January 05, 2009, **Dr. Abell** reported that the plaintiff: had gastroparesis,[9] with an unknown cause; had symptoms which did not change in response to multiple medications; had "a history of rapid emptying;"[10] had "marked improvements in symptoms and emptying" after placement of the temporary gastric pacemaker; and was "recommended for [a] permanent gastric [pacemaker]." (DE 10, p. 700). On January 08, 2009, **Dr. Abell** wrote that "[the plaintiff] has a well documented motility disorder. He is not capable of working full-time and…we recommend and support his approval for disability." (DE 10, p. 383).

**Dr. Chris Lahr, M.D.,** a surgeon at UMMC, evaluated the plaintiff on March 18, surgically placed the permanent gastric pacemaker on March 23, and discharged the plaintiff on March 27, 2009 (DE 10, pp. 433-36, 443-47). On March 23, 2009, Dr. Abell evaluated the plaintiff after surgery (DE 10, pp. 475-77). On April 03, 2009, Dr. Abell wrote that he would see the plaintiff "in several weeks, and…at 3, 6, and 12 months post implantation." (DE 10, p. 699).

On April 30, 2009, the plaintiff presented to Crocket Hospital ED, with abdominal pain and vomiting lasting all day (DE 10, pp. 666-68). An ED physician saw the plaintiff, noted vagus nerve[11] damage after the motor vehicle accident and observed the plaintiff "on hands and knees, vomiting." (DE 10, p. 666). The plaintiff was treated and discharged (DE 10, pp. 666-68). On

---

9 Dorland's Illustrated Medical Dictionary 765 (Elsevier 2012) (1900) (Gastroparesis: "paralysis of the stomach, usually from damage to its nerve supply, so that food empties out much more slowly, if at all. Symptoms include early satiety, nausea, and vomiting.").
10 *Id.* at 610 (Rapid gastric emptying: "excessively rapid movement of partially digested food from the stomach into the jejunum it occurs most often in patients who had had partial gastrectomy with gastrojejunostomy.").
11 *Id.* at 1261 (Vagus nerve: "tenth cranial nerve..It supplies sensory fibers to the ear, tongue, pharynx, and larynx, motor fibers to the pharynx, larynx, and esophagus, and parasympathetic and visceral afferent fibers to thoracic and abdominal viscera….").

May 26, 2009, the plaintiff presented to Crocket Hospital ED, with abdominal pain and vomiting (DE 10, pp. 657-63). The plaintiff was treated and discharged (DE 10, pp. 657-63).

On June 02, 2009, the plaintiff presented to **Dr. Leon Everett, M.D.** to establish Dr. Everett as his primary care provider and obtain medication refills (PCP) (DE 10, p. 531-32). On June 15, 2009, the plaintiff presented to Crocket Hospital ED, with abdominal pain and vomiting (DE 10, pp. 652-54). The plaintiff was treated and discharged (DE 10, pp. 652-54). The plaintiff presented to **Dr. Everett** from June through November of 2009 for "chronic pain management" and **Dr. Everett** reported at each monthly visit that the plaintiff was "doing well and without complaints, at patient's baseline, stable, controlled." (DE 10, pp. 519, 521, 523, 525, 527, 529).

On December, 01, 2009, the plaintiff presented to **Dr. Everett** with abdominal pain that began the day before, and "felt like [a] usual attack." (DE 10, p. 517). On the same day, the plaintiff presented to Crocket Hospital ED, with vomiting (DE 10, pp. 647-49). The plaintiff was seen by an ED physician, treated, and discharged (DE 10, pp. 647-49). On December 08, 2009, the plaintiff presented to Crocket Hospital ED, with abdominal pain and vomiting (DE 10, pp. 643-46). The plaintiff was seen by an ED physician, treated and discharged (DE 10, pp. 643-46). On December 15, 2009, the plaintiff returned to **Dr. Everett,** who noted that the plaintiff was "doing well and without complaints, at patient's baseline, stable, controlled." (DE 10, p. 515).

On January 04 and 13, 2010, the plaintiff presented to **Dr. Lee Hunter, M.D.** with complaints of a lump on his shoulder (DE 10, p. 537-38).[12] On February 09, 2010, the plaintiff presented to **Dr. Everett** with complaints of rectal bleeding and Dr. Everett recommended a colonoscopy (DE 10, p. 511). On March 09, 2010, the plaintiff returned to Dr. Everett, who

---

12 (DE 10, p. 537-38) Dr. Hunter reported that the plaintiff had symptoms of weight change, fatigue, nausea, vomiting, poor appetite, heartburn, joint pain and stiffness, dizziness, head injury, numbness and tingling, nervousness, blurred vision, mouth sores, and constipation.

noted that the plaintiff was "doing well and without complaints, at patient's baseline, stable, controlled." (DE 10, p. 509).

On April 21, 2010, the plaintiff followed-up with **Dr. Abell's nurse, Danielle Spree, CFNP, and Dr. Abell** at UMMC, who also recommended a colonoscopy because of the plaintiff's complaints (DE 10, pp. 693-95). The plaintiff reported that he had the settings on his permanent gastric pacemaker increased, "which seemed to help some with his symptoms." (DE 10, p. 693). He also reported that he had "fewer hospitalizations since the settings were increased [and the] cycles of symptoms [were] definitely less frequent and shorter in duration…he continues to have pain daily and reports it is worse in the morning…." (DE 10, p. 693). **Dr. Abell** ordered a consultation with **Dr. Ike Eriator, M.D.,** who saw the plaintiff on May 12, 2010 (DE 10, pp. 709-11). **Dr. Eriator** reported that the plaintiff would continue his treatment plan, including medication "when the intensity of pain gets significantly high and necessitates hospital visit." (DE 10, p. 710). On May 14th, **Dr. Abell** wrote that the plaintiff "[the plaintiff] has a well documented motility disorder, gastroparesis. He is not capable of working full-time…Prognosis for employment would be that I see him to be unable to return to work, part time or full time at this point…We recommend and support his approval for disability." (DE 10, p. 672).

On June 01 and 29 and July 27, 2010, the plaintiff presented to **Dr. Everett**, who reported that plaintiff was at his baseline, with no complaints (DE 10, p. 498-502). On August 09 and 19, 2010, the plaintiff presented to **Dr. Everett** with complains of stomach pain, nausea, and vomiting, and was treated with medication (DE 10, pp. 497-98, 535-36). On August 09, 2010, **Dr. Everett** completed a Gastrointestinal Medical Source Statement, in which he reported that the plaintiff: had gastroparesis and attacks on a monthly basis; had impairments that lasted or would be expected to last at least 12 months; had good days and bad days; could sit, stand, or

walk for less than 2 hours on a bad day and could sit, stand, or walk for at least 6 hours on a good day; would "need a job that permits shifting positions at will;" would "need a job that permits ready access to a restroom;" would "need to take unscheduled restroom breaks" as needed, sometimes every few minutes; would need to be able to "lie down or rest at unpredictable intervals" during symptom flares, but would ultimately be unable to work during [symptom] flares;" could rarely lift 50 pounds, occasionally lift 20 pounds, and frequently lift 10 to 20 pounds; could rarely stoop or bend, occasionally twist, crouch, squat, climb ladders, or stairs; would be capable of moderate stress; and would miss "about three days per month," if working fulltime, due to impairments or treatment (DE 10, pp. 493-96).

On November 02, 2010, the plaintiff presented to Crocket Hospital ED, where **Dr. Love** reported that the plaintiff had been recently discharged from the hospital, where he was being treated for pneumonia, "but returned less than 24 hours after discharge…with…abdominal pain, nausea…and intractable vomiting…[and that] when he was discharged from the hospital with pneumonia symptoms, he had no vomiting or any abdominal symptoms prior to discharge." (DE 10, pp. 739-46). **Dr. Dayaker Mallipeddi, M.D.** reported that the recurrent nausea and vomiting were "possibly medication induced."[13] (DE 10, p. 745).

### B.        Other Medical and Psychiatric Assessments

On January 09, 2009, Dr. Carol Lemeh, M.D. completed the Medical Consultant Analysis on behalf of Disability Determination Services (DDS) (DE 10, pp. 384-87).   Dr. Lemeh concluded that the record did not contain sufficient information on which to base the medical assessment (DE 10, p. 387).

---

13 The record does not show and the Court does not opine as to whether "medication induced" has any self-inflicted connotation or whether the term refers to a side-effect from medication.

On January 22, 2009, Rebecca Joslin, Ed.D. completed the Psychiatric Review on behalf DDS (DE 10, pp. 388-400). Joslin concluded that the plaintiff had no medically determinable impairment pertaining to his psychiatric status (DE 10, p. 400).

On February 11, 2009, Dr. Lemeh completed a second Medical Consultant Analysis on behalf of DDS (DE 10, pp. 428-31). Dr. Lemeh concluded that the plaintiff's impairments were "severe…but will improve to non-severe within 12 months." (DE 10, p. 428).

On June 09, 2009, the plaintiff presented to Dr. Woodrow Wilson, M.D. for an exam on behalf of the TN DDS (DE 10, p. 479). Dr. Wilson reported, inter-alia, that the plaintiff: "present[ed]…to get a current height and weight;" "has been diagnosed with gastroparesis;" "has chronic abdominal pain and chronic vomiting;" and has "a PICC…for medication and occasional IV fluids and is followed by home health care." (DE 10, p. 479).

On June 20, 2009, Dr. Carolyn Parrish, M.D. completed a Physical Residual Functional Capacity (RFC) Assessment (DE 10, pp. 481-89). Dr. Parrish summarized:

> The [plaintiff] has [a Medically Determinable Impairment] MDI that is cyclical in nature…As a result, his symptoms and impact on [Activities of Daily Living] ADLs are cyclical and [consistent with] c/w MDI during exacerbation. During non-impaired time frame, [plaintiff] has no significant restriction of ADLs. [Plaintiff] allegations of constant pain are not c/w disease or prior description of symptoms/limitations and not fully credible. RFC as written.

(DE 10, p. 489).

### C.  Testimonial Evidence

#### 1.  Plaintiff and Witness Testimony

On November 30, 2010, the plaintiff testified on direct examination by his representative, Clasbey, after Clasbey delivered an opening statement to the Court in which she described the

plaintiff's condition. The plaintiff testified that he last worked in July 2008, in the poultry industry (DE 10, p. 41-42). The plaintiff testified that he was terminated due to his illness:

> I'd gone into a severe episode in July of 2008, and was required to be hospitalized, in and out of the hospital for a couple of months…the doctors didn't want to release me…unless I had at least two weeks without symptoms…then I got in to see [Dr. Abell] in Mississippi…then, once my six month consecutive absence…came in, then they sent me a letter of termination.

(DE 10, pp. 42-43).[14] The plaintiff described his symptoms as including "severe vomiting, retching, excruciating pain…in [his] abdomen…to the point where I have a lot of weight loss, severe dehydration, and have to be hospitalized to just keep fluids in me and keep the pain controlled…." (DE 10, p. 43-44). The plaintiff testified that his symptoms began in 2000 and continued, eventually requiring hospitalization, and the gastric pacemaker placement in 2009 (DE 10, pp. 44-45). The plaintiff testified that after his symptoms were worse over the first few months after receiving the pacemaker (DE 10, p. 45). He testified that once Dr. Everett became his PCP, regulated his medication, and increased the settings of the pacemaker, his hospital visits decreased (DE 10, p. 45). The plaintiff testified that the purpose of the pacemaker was to "cut down on the number of episodes…but that it was not a cure." (DE 10, p. 46).

The plaintiff described his symptoms after the pacemaker placement and pacemaker level adjustment:

> I still have daily abdominal pain and cramping…I have episodes of vomiting at least on a monthly basis, but maybe not to the point where I would have to be hospitalized, but to the point where I'm unable to get up and do for myself…at least on a monthly basis. I have cramping where I am unable to do anything at least weekly…but to the point of

---

14 The Court takes notice of the discrepancy between this testimony, describing a job loss six months after the July 2008 onset date, and the record from the plaintiff's September 29, 2008 visit to Dr. Mertz, in which Dr. Mertz reported that the plaintiff had *already* lost his job: "He feels that stress is a big problem here as he has lost his job and home mortgage is hard for him to afford if he is unemployed…Because of his vomiting syndrome, he has been unable to stay at work regularly and has lost his job." (DE 10, p. 491). The Court similarly takes notice of the discrepancy between the testimony describing a job loss six months after the July 2008 onset date and the application for DIB and SSI filed on October 27, 2008 in which the plaintiff indicated he was still disabled (DE 10, p. 136).

actually vomiting and to the point of it being uncontrollable, maybe once or so a month…I'll be sick, just constantly throwing up green bile…have to lay in hot tubs of scalding water…."

(DE 10, pp. 46-47). Clasbey asked the plaintiff, "So, about monthly, for several days, you're having pain…and vomiting at the level you described?" (DE 10, p. 47). The plaintiff testified affirmatively. The plaintiff that when his symptoms are "not that bad," he still experiences abdominal pain and cramping, with pain that never really goes away (DE 10, pp. 47-48).

The plaintiff testified that he takes Lortab, Lyrica, and Dilaudid for pain control and clarified the dosing regimen (DE 10, p. 48). The plaintiff testified that on most days he takes five Lortab and a Dilaudid, but sometimes takes additional Dilaudid (DE 10, p. 48). The plaintiff testified that he takes Phenergan for nausea several days of the week (DE 10, p. 49). The plaintiff testified that he experiences side-effects from the medication, including "drowsiness…slurred kind of feeling" that interferes with his ability to concentrate (DE 10, p. 49).

The plaintiff testified further about "sitting in a scalding hot tub" to relieve symptoms (DE 10, p. 50). He testified that he does this several times a week, often after eating a meal, to try to prevent or avoid "an episode" of symptoms (DE 10, p. 50).

The plaintiff testified that physical exhaustion and extreme heat exacerbate his symptoms (DE 10, p. 52). The plaintiff testified that he has good days and bad days (DE 10, p. 53). On a good day, he could do household chores, take care of himself, with no vomiting and the ability to eat a meal (DE 10, p. 53). On a bad day, his symptoms completely limit him because he is "such pain and constantly throwing up." (DE 10, p. 53). He testified that his family helps him by bringing boiling water from the stove to the bath when he requires scalding hot baths (DE 10, p. 54). He testified that he will stay in the bath "for days at a time sometimes" except getting out to sleep (DE 10, p. 54).

The plaintiff testified that his body "fatigue[s] more rapidly than it used to" and that he can work for an hour or two, but then must sit for an hour or so (DE 10, p. 55). The plaintiff testified that in a week, he has "at least three bad days," and that in a month, he has three or four days when he is "sick, sick, sick, to the point of being in a tub…." (DE 10, p. 57).

The plaintiff testified that his normal weight was 160 to 170 pounds but that he weighed 145 pounds, and that with every severe episode, he loses "30 to 40 pounds." (DE 10, p. 58). The plaintiff testified that he filed bankruptcy after losing his job and lost his house because of the bankruptcy (DE 10, p. 59).

Next, the plaintiff testified on direct examination by the ALJ, David Ettinger. The plaintiff testified that he and his fiancé received food stamps and that his family helped to pay for his medical visits and his medication (DE 10, p. 60). He testified that he received a termination letter from his last place of employment on the last day of December, and subsequently received one unemployment check (DE 10, p. 61).

## 2.      Vocational Expert Testimony

The ALJ called the VE to testify. After a fifteen minute recess that the VE requested in order to review the claim file, the VE proceeded to categorize the plaintiff's past work (DE 10, pp. 64-67). The VE testified that the plaintiff's past work consisted of:  (1) a bricklayer-construction worker, which is heavy and skilled, with skills that would not transfer to a lighter level job; (2) a poultry vaccinator, which is medium and unskilled; (3) a farm worker poultry agriculture job, which is medium semiskilled, with no transferable skills; and (4) a poultry tender agriculture job, which is "most akin to the monitoring tech," the plaintiff's last job, and is heavy and unskilled and an SVP of 5 (DE 10, pp. 67-68).

The ALJ then presented the VE with a hypothetical scenario, considering a hypothetical person "who is 29 years old; had a graduate equivalency diploma, the same work experience as Mr. Mosley; and was capable of performing light work, with the exception that, on average, they would be absent from work one day… [every two] months for health related reasons." (DE 10, p. 68). The VE testified that a worker with such characteristics could not perform the [plaintiff's] past work because the past work was all medium or heavy (DE 10, p. 68).

The VE testified that the plaintiff could perform other work that would "require no more than light exertion…and would not be prohibited by an absence at a rate of one day every two months." (DE 10, p. 68). The VE testified that the plaintiff could perform (1) sedentary unskilled work as a telephone quotation clerk, with 1,732 employed in Tennessee and 86,000 employed nationally in this job; (1) light unskilled work as a house sitter, with 283 employed in Tennessee and 30,000 employed nationally; (3) light unskilled work as a courier-messenger, with 3,025 in Tennessee and 155,840 employed nationally in this job (DE 10, pp. 68-69).

The VE testified that the jobs he cited would remain available if an employee missed one day every month (DE 10, p. 69). The VE testified that if an employee missed two days every month, this would "significantly make a change" and that "the number of days absent that would begin to cause an effect on the person's ability to keep the job is around three and a half to four days per month." (DE 10, p. 69). The VE testified that if an employee missed three days of work every month, an employee in the courier-messenger job would be most affected, an employee in a house-sitter job would not be affected at all, and an employee in a telephone quotation job could still maintain their job (DE 10, p. 70).

In response to questioning by Clasbey, the VE testified that "I think people who are absent on the clock one day a month, two days a month, three days a month…I can assure you

that that person wouldn't remain employed in most places for a full year." (DE 10, p. 75). The VE testified that the need for immediate and unpredictable access to a bathroom would affect the availability of jobs, and that there is variance in employer tolerability to such requirements. (DE 10, p. 76).

### III. Analysis

#### A. Standard of Review

The issue before the Court, pursuant to 42 U.S.C. § 405(g), is limited to whether there is substantial evidence in the record to support the Commissioner's findings of fact. "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Carrelli v. Comm'r of Soc. Sec.*, 390 F. App'x 429, 434 (6th Cir. 2010) (quoting *Cutlip v. Sec'y of Health & Human Servs.,* 25 F.3d 284, 286 (6th Cir.1994)). The Court "may not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Carrelli*, 390 F. App'x 429 at 434. If there is "substantial evidence" in the record that supports the Commissioner's decision and the Commissioner applied the correct legal standard, then the Court must affirm the Commissioner's final decision, "even if the Court would decide the matter differently, and even if substantial evidence also supports the [plaintiff's] position." *Id.* (quoting *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir.1986) (en banc)).

#### B. Administrative Proceedings

Disability is defined consistently for Title II DIB and Title XVI SSI claims as an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months…." 42 U.S.C. §§

423(d)(1)(A) and 1382(c)(a)(3)(A); 20 C.F.R. §§ 404.1505 and 416.905. The ALJ uses a five-step sequential evaluation for both DIB and SSI claims to determine whether the plaintiff meets this definition of "disabled." 20 C.F.R. §§ 404.1520(a)(4)(i)-(v) and 416.920(a)(4)(i)-(v).

i.    If the plaintiff is engaged in substantial gainful activity, the Court will find that the plaintiff is not disabled.

ii.   If the plaintiff *does not* have a severe medically determinable physical or mental impairment meeting the duration requirement or a combination of such impairments, the Court will find that the plaintiff is not disabled.

iii.  If the plaintiff *does* have an impairment(s) that meets or equals one of the listings of impairments in 20 C.F.R. pt. 404, Subpt. P, App. 1 (Appendix 1) and meets the duration requirement, the Court will find that the plaintiff is disabled.

iv.   The court considers the plaintiff's Residual Functional Capacity (RFC) and past relevant work. If the plaintiff can still perform their past relevant work, the Court will find that they are not disabled.

v.    The Court considers the plaintiff's RFC, age, education, and experience to determine if the plaintiff can perform work *other than* past relevant work. If the plaintiff can make an adjustment, the Court will find that they are not disabled.

The plaintiff has the burden of proof for steps one to four. *Carrelli*, 390 F. App'x at 435. The burden shifts to the Commissioner at step five, where the Commissioner must "identify a significant number of jobs in the economy that accommodate the [plaintiff's] RFC and vocational profile." *Id.* To meet the burden, the ALJ may use the medical-vocational guidelines in 20 C.F.R. pt. 404, Subpt. P, App. 2 (Appendix 2). 20 C.F.R. §§ 404.1569 and 416.969.

Appendix 2 is referred to as "the grid," and provides guidance to the ALJ in determining whether the plaintiff is disabled or whether significant numbers of *other* jobs exist for the plaintiff. *Wright v. Massanari*, 321 F.3d 611, 615 (6th Cir. 2003). "Where the findings of fact made with respect to a particular individual's vocational factors and RFC coincide with all of the criteria of a particular rule [in the grid], the rule directs a conclusion as to whether the individual

is or is not disabled." *Anderson v. Comm'r of Soc. Sec.*, 406 F. App'x 32, 35 (6th Cir. 2010) (quoting Appendix 2 at § 200.00(a)). Otherwise, instead of using the grid alone, the ALJ must consider all relevant facts. 20 C.F.R. §§ 404.1569 and 416.969.

### C.     Administrative Reliance on Vocational Expert Testimony

If a plaintiff's limitations "do not satisfy the exact requirements of the medical-vocational guidelines, the ALJ [is] entitled to rely on the testimony of a VE in reaching his decision" as to whether the plaintiff is disabled or whether the plaintiff is not disabled and a significant number of jobs exist that the plaintiff can perform. *Range v. Soc. Sec. Admin.*, 95 F. App'x 755, 757 (6th Cir. 2004).  If an "issue in determining whether [a plaintiff] is disabled is whether [their] work skills can be used in other work and the specific occupations in which they can be used…, [the ALJ] may use the services of a VE…." 20 C.F.R. §§ 404.1566(e) and 416.966(e).

What number of jobs in the national economy constitutes a "significant number" of jobs is a determination that must be made on a case-by-case basis. *Born v. Sec'y of Health & Human Servs.*, 923 F.2d 1168, 1174 (6th Cir. 1990) (citing *Hall v. Bowen,* 837 F.2d 272, 275 (6th Cir. 1988)). The ALJ may consider "the level of claimant's disability; the reliability of the vocational expert's testimony; the reliability of the claimant's testimony; the distance claimant is capable of travelling to engage in the assigned work; the isolated nature of the jobs; the types and availability of such work, and so on." *Id.*

### D.     District Court Authority to Remand

"A district court's authority to remand a case…is found in 42 U.S.C. § 405(g)…." *Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 482-83 (6th Cir. 2006). "Sentence four" and "sentence six" of this statute both authorize remands. *Hollon ex rel. Hollon*, 447 F.3d at 483. Sentence four provides that "[t]he court shall have power to enter, upon the pleadings and

transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Therefore, "a district court may order a 'sentence four' remand…, if it determines that a rehearing before the Commissioner is warranted…." *Hollon ex rel. Hollon*, 447 F.3d at 483.

### E.     Notice of Decision

On December 20, 2010, the ALJ denied the plaintiff's claims (DE 10, pp. 21-36), and made the findings of fact and conclusions of law enumerated below.

1. Claimant meets the insured status requirements of the Act through December 31, 2013.

2. Claimant has not engaged in substantial gainful activity since July 14, 2008, the alleged onset date.

3. Claimant has the following severe impairment:  cyclic vomiting syndrome.

4. Claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in Appendix 1.

5. Claimant has the [Residual Functional Capacity] RFC to perform light work except that he would be absent from work on average one day per month.

6. Claimant is unable to perform any past relevant work.

7. Claimant was 26 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8. Claimant has at least a high school education and is able to communicate in English.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11. The claimant has not been under a disability, as defined in the Act, from July 14, 2008, through the date of this decision.

(DE 10, pp. 26-30). On December 20, 2010, the ALJ made the specific decisions below.

1. Based on the application for a period of disability and DIB filed on October 08,[15] 2008, the claimant is not disabled under sections 216(i) and 223(d) of the Act.

2. Based on the application for SSI filed on October 08, 2008, the claimant is not disabled under section 1614(a)(3)(A) of the Act.

(DE 10, p. 30).

## IV.        Claims of Error

### A.        Whether the ALJ Inappropriately Considered the Opinions of Treating Physicians

The plaintiff argues that the ALJ "rejected"[16] the opinions of five physicians, who were

allegedly treating physicians (DE 15, p. 14).

### 1.        Treating Physicians

The plaintiff argues that Dr. Dobias, Dr. Mertz, Dr. Abell, Dr. Lahr, and Dr. Everett were

treating physicians (DE 15, pp. 19-24). Each is considered below.

A "treating source" is a plaintiff's "own physician, psychologist, or other acceptable

medical source who provides…or has provided…medical treatment or evaluation and who has,

or has had, an ongoing treatment relationship[17] with [the plaintiff]." 20 C.F.R. §§ 404.1502 and

416.902. A "[n]on-treating source means a physician, psychologist, or other acceptable medical

---

15 (DE 10, pp. 134-39; 140-44) The plaintiff protectively filed for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) on October 27, 2008.

16 Social Security Ruling (SSR) 96-2P, 1996 WL 374188 (emphasis added) ("[an ALJ] finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is ***rejected***. It may still be entitled to deference and be adopted by the [ALJ]."). Therefore, use of the word "rejected" in the plaintiff's argument may be unintentionally misleading to the extent it implies that the ALJ's decision not to give controlling weight to treating physicians' opinions equated to outright rejection of the opinions.

17 20 C.F.R. §§ 404.1502 and 416.902 (An "ongoing treatment relationship" is a relationship for which "the medical evidence establishes that [the plaintiff] see[s], or ha[s] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition(s). [An ALJ] may consider an acceptable medical source who has treated or evaluated [a plaintiff] only a few times or only after long intervals…to be [the] treating source if the nature and frequency of the treatment or evaluation is typical for [the] condition(s).").

source who has examined [the plaintiff] but does not have, or did not have, an ongoing treatment relationship with [the plaintiff]. 20 C.F.R. §§ 404.1502 and 416.902.

### Dr. Dobias and Dr. Mertz

There is an issue that is isolated to Dr. Dobias and Dr. Mertz. The issue is whether the physicians' opinions offered prior to the alleged onset date are relevant to whether those physicians were treating physicians, even though the opinions are not relevant, in this case, to the medical history. The opinions offered prior to the alleged onset date are not relevant to the medical history by virtue of regulation. The regulations require an ALJ to develop a "complete medical history," meaning that for a plaintiff who alleges an onset date "*less than 12 months before [they] filed*…, [the ALJ] will develop [the] complete medical history *beginning with the month [the plaintiff] say[s] [their] disability began* unless [the ALJ has] reason to believe [the] disability began earlier." 20 C.F.R. §§ 404.1512(d)(2) and 416.912(d)(2)  (emphasis added).

The plaintiff alleged an onset date of July 14, 2008 (DE 10, p. 136), less than 12 months before he filed on October 27, 2008 (DE 10, p. 134-39; 140-44). The record does not show that the ALJ had reason to believe that the disability began earlier since the plaintiff was engaged in substantial gainful activity from 1997 through July 2008 (DE 10, p. 175). Therefore, the ALJ considered the medical history beginning in July 14, 2008, in compliance with the regulations (DE 10, p. 27). However, regarding treating physicians, the issue remains as to whether the physicians' opinions offered after the plaintiff's motor vehicle accident in June 2000 and before the alleged onset date in July 2008 are relevant to determining whether the physicians who offered the opinions were treating physicians. Dr. Dobias' and Dr. Mertz's opinions fit in this interstitial milieu.

Dr. Dobias evaluated the plaintiff after the motor vehicle accident in June 2000 (DE 10, p. 549, 555), and later treated and evaluated the patient on a monthly basis from July through November 2008 (DE 10, p. 291-97). Dr. Dobias admitted the plaintiff to Crocket Hospital ED on the alleged onset date, then saw the plaintiff at follow up visits, noting that the plaintiff was "better, still weak;" was "some better;" had lost weight; would possibly be able to return to work if he improved; was "not able to eat;" and "[was] trying to get…disability." (DE 10, pp. 291-97). Dr. Dobias reported that the plaintiff "has had a horrible time…is really incapacitated… is not able to work at the present time and may not long term…." (DE 10, p. 292). Therefore, the record provides substantial evidence that Dr. Dobias was a treating physician, even based solely on the treatment records from the time period after the alleged onset date.

Dr. Mertz saw the plaintiff twice before the alleged onset date and just once afterwards. Again, the main issue of whether Dr. Mertz is a treating physician involves the associated issue of whether his opinions offered before the alleged onset date, and in this case before the time period considered for the medical history, are *relevant* to the main issue of whether he was a treating physician. Dr. Mertz performed procedures and prescribed treatment in November 2001, and October 2006, and evaluated and treated the plaintiff in September 2008 (DE 10, pp. 618, 634, 491). If the Magistrate Judge considers only the September 2008 visit, the record still provides substantial evidence that Dr. Mertz was a treating physician.  During that visit, Dr. Mertz documented that the plaintiff:  "return[ed] in follow up for his cyclic vomiting syndrome;" "ha[d] been seen by me several times in the past;" and had "[a procedure to test for small bowel obstruction]…done by me twice in the past as well." (DE 10, p. 491). Therefore, the record provides substantial evidence that Dr. Mertz was a treating physician, even based solely on the record from the period after the alleged onset date.

**Dr. Abell, Dr. Lahr, Dr. Everett**

Dr. Abell performed a temporary gastric pacemaker placement on December 22, 2008 (DE 10, pp. 303, 700), ordered a neurology consultation (DE 10, pp. 305, 319), evaluated the plaintiff on December 24 and 30, 2008 (DE 10, pp. 303, 437-40, 705-08), and evaluated the plaintiff after the permanent pacemaker placement on March 23, 2009 (DE 10, pp. 475-77). Dr. Abell also wrote letters in support of the plaintiff's disability application on January 08, 2009 and May 14, 2010 (DE 10, pp. 383, 672). Therefore, the record provides substantial evidence that Dr. Abell was a treating physician.

Dr. Lahr evaluated the plaintiff prior to surgery on March 18, 2009 and placed the permanent gastric pacemaker, which Dr. Abell planned for and scheduled, on March 23, 2009 (DE 10, pp. 433-36, 439, 443-47). In a patient note from April 21, 2010, Dr. Abell's nurse, Danielle Spree, CFNP, wrote that the plaintiff had followed up with Dr. Lahr since the surgery (DE 10, pp. 693-95). However, the record contains no other evidence to suggest that the plaintiff actually saw Dr. Lahr after the pre-operative and surgical visits. The record does show that Dr. Lahr planned for the plaintiff's follow up care to be "per Dr. Abell's office." (DE 10, p. 444). Therefore, the record provides substantial evidence that Dr. Lahr is a non-treating physician because he did not have an ongoing treatment relationship with the plaintiff under 20 C.F.R. §§ 404.1502 and 416.902.

Dr. Everett became the plaintiff's PCP in June 2009 and evaluated the plaintiff on a monthly basis through August 2010 (DE 10, pp. 497-536). On August 09, 2010, Dr. Everett completed a Gastrointestinal Medical Source Statement (DE 10, pp. 493-96). Therefore, the record provides substantial evidence that Dr. Everett was a treating physician.

The record provides substantial evidence that Dr. Dobias, Dr. Mertz, Dr. Abell, and Dr. Everett were treating physicians while Dr. Lahr was a non-treating physician.

## 2. Weight Given to Medical Sources' Opinions

The plaintiff argues initially that the ALJ's "failure to give 'good reasons' for rejecting[18] the opinions of multiple treating physicians...is reversible error...." (DE 15, p. 14). To the extent the plaintiff argues separately that the record "does not support the contention that the plaintiff can sustain full-time work," this argument is disposed of herein with the mandatory treating physician rule analysis. The argument as to whether the plaintiff can sustain full-time work implicates the ALJ's determination of the plaintiff's RFC. Simply, the ALJ's "assessment of the medical evidence…is particularly important at Step 5…" because the RFC is used "to assess the [plaintiff's] ability to perform work." *Cole v. Astrue*, 661 F.3d 931, 939 (6th Cir. 2011). In order for the ALJ to appropriately consider the plaintiff's ability to perform work, and in order for "a VE's testimony to constitute substantial evidence that a significant number of jobs exists, 'the [ALJ's] question[s] must accurately portray a [plaintiff's]…impairments.'" *Cole*, 661 F.3d at 939 (quoting *Ealy,* 594 F.3d at 516). Therefore, even if the medical opinions herein were not "ultimately…accorded controlling weight as to [the plaintiff's] RFC, the ALJ did not go through the required analysis to arrive at that conclusion" and the case must be remanded. *Cole*, 661 F.3d at 939.

## The Treating Physician Rule

When an ALJ is reviewing the "medical evidence supplied in support of a claim, there are certain governing standards to which an ALJ must adhere. Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating

---

18 *See Supra* note 16.

physicians, commonly known as the ***treating physician rule***." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (emphasis added) (citing SSR 96–2P, 1996 WL 374188; *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir.2004)). According to the treating physician rule, and pursuant to 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2), "[i]f [an ALJ] find[s] that a treating source's opinion ***on the issue(s) of the nature and severity of [the plaintiff's] impairment(s)*** is ***well-supported***…and is ***not inconsistent*** with the other substantial evidence…, [the ALJ] will give it controlling weight." 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2) (emphasis added); *Wilson*, 378 F.3d at 544.

"There is an additional procedural requirement associated with the treating physician rule [whereby]…the ALJ must provide "***good reasons***" for discounting treating physicians' opinions…." *Rogers*, 486 F.3d at 242 (emphasis added). In other words, if an ALJ ***does not*** give a treating source's opinion controlling weight, then the ALJ must provide good reasons for the weight they do give to the treating source's opinion. 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2). "This ***procedural 'good reasons' rule*** serves both to ensure adequacy of review and to give the claimant a better understanding of the disposition of his case." *Dunlap v. Comm'r of Soc. Sec.*, 509 F. App'x 472, 474 (6th Cir. 2012) (emphasis added) (citing *Rogers*, 486 F.3d at 242). The procedural good reasons rule is important "particularly in situations where a [plaintiff] knows that [their] physician has deemed [them] disabled and therefore 'might be especially bewildered when told by an administrative bureaucracy that [they are] not, unless some reason for the agency's decision is supplied.'" Wilson, 378 F.3d at 544-45 (quoting *Snell v. Apfel,* 177 F.3d 128, 134 (2d Cir.1999)).

If an ALJ ***does not*** give a treating source's opinion controlling weight, then the ALJ must consider all of the following factors in deciding what discounted weight to give to the treating

sources's opinion: (c)(1) examining relationship; (c)(2)(i) length of the treatment relationship and frequency of examination; (c)(2)(ii) nature and extent of the relationship; (c)(3) supportable medical evidence; (c)(4) evidence that is consistent with the record; (c)(5) specialization; and (c)(6) other factors. 20 C.F.R. §§ 404.1527(c) and 416.927(c). The ALJ will also consider these factors when determining what weight to give to the opinion of a non-treating or non-examining source even though those opinions "are never assessed for 'controlling weight.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013), reh'g denied (May 2, 2013).

### Mandatory Nature and De Minimis Violation of the Treating Physician Rule

The Sixth Circuit has ruled that the treating physician rule is a mandatory procedural requirement. *Wilson*, 378 F.3d at 546.

> A court cannot excuse the denial of a mandatory procedural protection simply because…there is ***sufficient evidence*** in the record for the ALJ to discount the treating source's opinion and, thus, a different outcome on remand is unlikely. To hold otherwise, and to recognize ***substantial evidence*** as a defense to non-compliance with § 1527([c])(2),[19] would afford the [ALJ] the ability the violate the regulation with impunity and render the protections promised therein illusory.

*Wilson*, 378 F.3d at 546 (emphasis added). Therefore, despite the standard of review whereby the reviewing Court is limited to whether there is ***substantial evidence*** in the record to support the Commissioner's findings of fact, no amount of substantial evidence in the record can excuse an ALJ's failure to follow the treating physician rule.

However, the Sixth Circuit has also ruled that there are potential scenarios in which an ALJ's failure to follow the treating physician rule could constitute a "de minimis violation," which in turn could constitute "harmless error." *Wilson*, 378 F.3d at 547. These potential scenarios include when: (1) "a treating source's opinion is so patently deficient that the [ALJ]

---

19 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2) (current version at 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2) (2012)).

could not possibly credit it;" (2) "the [ALJ] adopts the opinion of the treating source or makes findings consistent with the opinion, [in which case] it may be irrelevant that the ALJ did not give weight to the treating physician's opinion, and the failure to give reasons for not giving such weight is correspondingly irrelevant;" or (3) "the [ALJ] has met the goal of § 1527([c])(2)[20]…even though [they have] not complied with the terms of the regulation." *Id.*

The Sixth Circuit has interpreted the "harmless error exception" to clarify these potential scenarios. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747-48 (6th Cir. 2007) FIX THESE CITES. In *Bowen*, the ALJ failed to mention a treating source, and the Court did not find a de minimis violation because "invoking the harmless error exception…where the ALJ entirely failed to address the primary treating source's presumptively supportable opinion plainly risks having the exception swallow the rule." *Bowen*, 478 F.3d at 750. In *Hall*, the Court did not find a de minimis violation because the "Court was unable to discern the ALJ's reasons for the weight that he gave to the opinion of [the plaintiff's] treating physician." In *Nelson*, the Court did find a de minimis violation when the ALJ had referred to two treating physicians "but had not fully explained why he accorded them little weight…Nevertheless, the court held that those brief references, which arose in…discussing a multitude of contrary medical evidence, met the regulatory goal of addressing the opinions of the treating sources as well as their inconsistency with the [entire] record…." *Bowen*, 478 F.3d at 748 (citing *Nelson v. Comm'r of Soc. Sec.,* 195 Fed.Appx. 462, 470-72 (6th Cir.2006)).

### Dr. Dobias, Dr. Mertz, Dr. Lahr

The plaintiff argues that the ALJ "did not mention or deal with" the opinion of Dr. Dobias, Dr. Mertz, or Dr. Lahr. (DE 15, p. 19).

---

20 *Id.*

The record shows that the ALJ did consider the treatment record of Dr. Dobias and acknowledged that Dr. Dobias was the plaintiff's PCP (DE 10, p. 27). However, the record also shows that the ALJ did not analyze the opinion of Dr. Dobias under the treating physician rule because he did not give a weight to, or provide a reason for discounting, the opinion of Dr. Dobias. Yet, the record shows that the ALJ's failure to follow the treating physician rule constituted a de minimus violation of the regulation and therefore harmless error of the type described in the second scenario in *Wilson*. As that scenario explains, an ALJ's failure to follow the treating physician rule may constitute a de minimis violation of the rule when the ALJ nonetheless "makes findings consistent with the [treating source's] opinion," *Wilson*, 378 F.3d at 547. The ALJ noted that the plaintiff "was acutely ill from July 14, 2008 through December 24, 2008," consistent with the treatment records of Dr. Dobias (DE 10, p. 291-97). While the ALJ could have been more explicit in his reasoning, under the harmless error exception, it is "irrelevant that the ALJ did not give weight to the treating physician's opinion, and the failure to give reasons for not giving such weight [are] correspondingly irrelevant."

The record shows that the ALJ did not analyze the opinion of Dr. Mertz under the treating physician rule because he did not cite the treatment record of Dr. Mertz, did not give a weight to the opinion of Dr. Mertz, and did not provide a reason for omitting, much less discounting, the opinion of Dr. Mertz. The record provides substantial evidence that Dr. Mertz was a treating physician, even based solely on the record after the alleged onset date because Dr. Mertz's medical history referenced the ongoing treatment relationship that he had with the plaintiff and Dr. Mertz's clinical impression documented that "[the plaintiff] ha[d] symptoms of irritable bowel syndrome and cyclic vomiting;" "was doing terribly;" and "had approximately three months of great difficulty and progressive weight loss." (DE 10, p. 491). The scenarios of

possible de minimus regulatory violations and harmless error in *Wilson* do not suggest that any admittedly sparse treatment record excuses an ALJ's disregard of a treating source's opinion. To the contrary, in *Bowen*, the ALJ failed to mention a treating source, and the Court did not find a de minimis violation because "invoking the harmless error exception…where the ALJ entirely failed to address the primary treating source's presumptively supportable opinion plainly risks having the exception swallow the rule." *Bowen*, 478 F.3d at 750.

The record shows that Dr. Lahr was a non-treating physician and that the ALJ, although minimally, considered the factors in 20 C.F.R. §§ 404.1527(c) and 416.927(c), as required when assessing the opinion of a non-treating source. The record shows that the ALJ considered the (c)(2)(i) length of the treatment relationship and frequency of examination; and the (c)(2)(ii) nature and extent of the relationship: "[d]uring his next visit on March 18, 2009." (DE 10, p. 27) The record shows that the ALJ considered (c)(3) supportable medical evidence; and (c)(4) evidence that is consistent with the record: "the plaintiff was noted to have had marked improvement with no symptoms since the implant…." (DE 10, p. 27). The record shows that the ALJ considered (c)(5) specialization, since Dr. Lahr was the plaintiff's surgeon: "plans were made to implant a permanent gastric pacemaker." (DE 10, p. 27). The record shows that the ALJ considered these factors in deciding what weight to give to Dr. Lahr's opinion, and while the ALJ never indicated what weight that was, the opinion was never entitled to controlling weight.

Therefore, the record provides substantial evidence that: (1) the ALJ failed to follow the treating physician rule when assessing the opinion of Dr. Dobias, but that this failure constituted a de minimis violation of the rule and therefore harmless error; (2) the ALJ failed to follow the treating physician rule when assessing the opinion of Dr. Mertz, which did not constitute a de

minimis violation of the rule because the ALJ wholly failed to mention the treating source; and (3) the ALJ appropriately considered the required factors when assessing the opinion of Dr. Lahr.

## Dr. Abell

The plaintiff argues that "the ALJ did not give good, specific reasons to reject the opinions of Dr. Abell." (DE 15, p. 22).

The record shows that the ALJ did not appropriately analyze the opinion of Dr. Abell under the treating physician rule because, while the ALJ provided the weight and the reasons for the weight that he gave to the opinion of Dr. Abell, the reasons that the ALJ provided are inconsistent with the record, and therefore not "good reasons." The ALJ gave "little weight to the conclusory opinion of Dr. Abell because [Dr. Abell] ha[d] not seen [the plaintiff] since March 23, 2009 and because his notes indicate[d] that the [plaintiff] had remarkable improvement after his gastric pacemaker was implanted." (DE 10, pp. 28-29). This statement contains two assertions: (1) that the plaintiff experienced remarkable improvement and (2) that the opinion of Dr. Abell was conclusory.

The record does not provide substantial evidence to support the contradictory reasoning implicit in the first assertion. The reasoning is contradictory because if Dr. Abell *last* saw the plaintiff on March 23, the day that the plaintiff had the permanent gastric pacemaker placed, then he could not have seen the plaintiff *thereafter* to document remarkable improvement, as the ALJ suggests. Instead, what the record shows is that Dr. Abell did see the plaintiff on March 23, at which time he documented that the plaintiff *previously* underwent a temporary gastric pacemaker placement in December 2008, after which "he had an overall significant improvement in his symptoms…." thereby prompting the decision to proceed with the permanent gastric pacemaker (DE 10, p. 475). Dr. Abell's assessment of the plaintiff's significant improvement after a

temporary gastric pacemaker placement cannot provide substantial evidence that Dr. Abell also assessed improvement after the later permanent pacemaker placement. Reliance on an inaccurate treatment timeline cannot provide a good reason for deciding not to give a treating physician controlling weight. The Magistrate Judge does not "resolve conflicts in evidence," such as whether the plaintiff did have remarkable improvement. *Carrelli*, 390 F. App'x 429 at 434. The Magistrate Judge does, however, look for evidence in the record that "a reasonable mind might accept as adequate to support a conclusion." *Id.* Here, there is no evidence to support the ALJ's conclusion because the reasoning for the conclusion is contradictory and even a review of the record does not reveal support for the conclusion. Therefore, the reasoning that the ALJ provided would rest on his assertion that the opinion of Dr. Abell was conclusory.

The record does not provide substantial evidence to support the second assertion that the opinion of Dr. Abell was conclusory. An ALJ can explain their failure to give controlling weight to the opinion of a treating source if the source offered only conclusory statements because "[c]onclusory statements from physicians are properly discounted by ALJs." *White v. Comm'r of Soc. Sec.,* 572 F.3d 272, 286 (6th Cir. 2009) (citing *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir.2001). Conclusory, in this context, means an opinion with a "lack of detail" or a failure by the source to "point to particular documents in [the plaintiff's] medical history supporting the doctor's conclusions." *White*, 572 F.3d at 286. However, the record does not show, and the ALJ does not allege, that Dr. Abell's opinion suffered from a lack of detail or that Dr. Abell failed to support his conclusions. Instead, the ALJ notes that "Dr. Abell wrote virtually identical…letters indicating that [the plaintiff] cannot work 'part time or full time at this point.'" (DE 10, p. 28). Dr. Abell did write such letters, but virtually identical content cannot support the assertion that Dr. Abell's opinions were conclusory, especially since the identical content in the letters

consisted of Dr. Abell either including or referencing copies of the plaintiff's medical history to support his conclusions: "I have enclosed copies of our records which address [the plaintiff's] [gastrointestinal] GI disorder in detail;" "We will be happy to send you copies of our records which address the plaintiff's GI disorder in detail." (DE 10, pp. 383, 672). The ALJ does not indicate why the opinion of Dr. Abell is conclusory and even a review of the record does not reveal support for the conclusion.

The record does not show that the ALJ's failure to follow the treating physician rule and failure to provide good reasons for the weight he gave to the opinion of Dr. Abell constituted a de minimus violation of the treating physician rule and therefore harmless error as described in *Wilson*. The record does not show that Dr. Abell's opinion was "so patently deficient that the [ALJ] could not possibly credit it." *Wilson*, 378 F.3d at 547. As the Defendant points out, "[t]he parties do not dispute that Dr. Abell was a treating specialist." (DE 18, P. 17). The ALJ did not "adopt the opinion of the [Dr. Abell] or make findings consistent with the opinion." *Id.* Finally, the record does not show that "the [ALJ] has met the goal of § 1527([c])(2).[21]" *Id.* The treating physician rule and good reasons rule implicit in it are intended to prevent plaintiff bewilderment, particularly in a situation such as the instant case, where a treating physician not only deemed the plaintiff disabled but wrote two letters in support of the plaintiff's disability application.

Therefore, while the ALJ provided reasons for not giving controlling weight to the opinion of Dr. Abell, the reasons are not supported by substantial evidence in the record and the failure to follow the treating physician rule does not constitute a de minimus violation of the rule or harmless error.

---

21 *Id.*

**Dr. Everett**

The plaintiff argues that, as in *Hall*, "the ALJ's lack of specificity in reasoning places the court in the position of not being able to discern the ALJ's reasons for the weight that the ALJ gave to the part of Dr. Everett's opinion he deemed 'inconsistent.'" (DE 15, p. 22).

The record shows that the ALJ did appropriately analyze the opinion of Dr. Everett under the treating physician rule. The ALJ gave "substantial weight to the opinion of Dr. Everett;" and agreed with the opinion of Dr. Everett that the plaintiff "continue[d] to have periods of acute symptoms or 'flares' during which he would not be able to work;" but noted that the plaintiff "rarely reported flares to Dr. Everett and ha[d] only infrequently required emergency room or inpatient treatment since March 2009." (DE 15, p. 23). The ALJ agreed with Dr. Everett's opinion that the plaintiff's "episodes occur every 3-4 months;" but did not agree "with other inconsistent statements made in [Dr. Everett's] medical source statement." (DE 10, p. 29).

The record provides substantial evidence to support the ALJ's decision not to give controlling weight to Dr. Everett, and the ALJ provided good reasons for his decision in compliance with 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2). An ALJ will not give a treating source's opinion controlling weight if it is inconsistent with the other substantial evidence in the record. 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2). The ALJ cited "inconsistent statements…in [the] medical source statement" that Dr. Everett wrote, and explained that while Dr. Everett indicated that the plaintiff had "extreme limitations," this was inconsistent with Dr. Everett's own comments, indicating that "episodes occur every 3-4 months," inconsistent with the plaintiff "rarely report[ing] flares to Dr. Everett," and inconsistent with "only infrequently require[ing] emergency room or inpatient treatment since March 2009." (DE 10, p. 29). Although the ALJ agreed with Dr. Everett's opinion that the plaintiff experienced episodes

"every 3-4 months," the ALJ did not give controlling weight to the opinion of Dr. Everett because of the inconsistency between evidence, in compliance with 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2). The ALJ also provided good reasons for the weight he gave to the opinion of Dr. Everett, citing the inconsistencies on which he based his decision.

The record shows that this case is unlike *Hall*, because the ALJ complied with the treating physician rule when assessing the opinion of Dr. Everett, and the Court therefore does not need to address whether a failure to comply with the treating physician rule constituted a de minimis violation of the regulation or harmless error on the part of the ALJ.

The record also shows that the ALJ considered the factors in 20 C.F.R. §§ 404.1527(c) and 416.927(c) in deciding what weight to give to Dr. Everett's opinion. The record shows that the ALJ considered the (c)(2)(i) length of the treatment relationship and frequency of examination; and the (c)(2)(ii) nature and extent of the relationship: "[the plaintiff] received extensive outpatient treatment from Dr. Leon Everett from June 2, 2009 through August 30, 2010 (DE 10, pp. 27-28). The record shows that the ALJ considered (c)(3) supportable medical evidence; and (c)(4) evidence that is consistent with the record: "On a few occasions, [the plaintiff] complained of stomach pain or vomiting. On the great majority of office visits, however, he had no complaints." (DE 10, p. 28). The record shows that to the extent the ALJ could consider (c)(5) specialization as it applied to Dr. Everett, the ALJ acknowledged that Dr. Everett was the plaintiff's PCP (DE 10, p. 28).

Therefore, the record provides substantial evidence that the ALJ did not give controlling weight to the opinion of Dr. Everett, provided good reasons for his decision, and considered the appropriate factors in deciding what weight to give, all in compliance with 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2).

## V.        Conclusion

ALJ failed to follow the treating physician rule when assessing the opinions of Dr. Mertz and Dr. Abell, which did not constitute de minimus violations of the treating physician rule or harmless error. The Sixth Circuit "'has made clear that [it] do[es] not hesitate to remand when the [ALJ] has not provided good reasons for the weight given to a treating physician's opinion." *Gayheart*, 710 F.3d at 380 (quoting *Cole,* 661 F.3d at 939 (internal quotation marks omitted)). The narrow impasse here, preventing affirmation of the ALJ's decision, is that the ALJ may not "ignore or reject…physicians' opinions without giving a principled basis for doing so." *Minor v. Comm'r of Soc. Sec.*, 12-1268, 2013 WL 264348 (6th Cir. Jan. 24, 2013); 20 C.F.R. §§ 404.1527 and 416.927; *Wilson,* 378 F.3d at 544.

## VI.        Recommendation

For the reasons explained above, the Magistrate Judge **RECOMMENDS** that the plaintiff's motion for judgment on the administrative record (the record) be **GRANTED**, the Commissioner's decision be **REVERSED**, and the cause **REMANDED** for further administrative proceedings consistent with this report and recommendation, to include rehearing.

The parties have fourteen (14) days, after being served with a copy of this Report and Recommendation (R&R) to serve and file written objections to the findings and recommendation proposed herein.  A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140 *reh'g denied*, 474 U.S 1111 (1986); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

**ENTERED** this 6th day of August, 2013.

s/Joe B. Brown_____
Joe B. Brown
U.S. Magistrate Judge